745 So.2d 354 (1999)
Daniel GOULD, Appellant,
v.
STATE of Florida, Appellee.
Nos. 96-2388, 97-0269.
District Court of Appeal of Florida, Fourth District.
September 17, 1999.
Rehearing Denied December 6, 1999.
*355 Bert Winkler, West Palm Beach, for appellant.
Robert A. Butterworth, Attorney General, Tallahassee, and Barbra Amron Weisberg, Assistant Attorney General, West Palm Beach, for appellee.
*356 PER CURIAM.
Appellant challenges his conviction and sentence for two counts of sexual battery upon a person under twelve years of age. We affirm in part and remand for proceedings consistent with this opinion.
Appellant was convicted for sexual battery upon his stepson, C.K. C.K. is a child who was raised mostly by his grandmother in a house with fifteen residents. At some point, C.K.'s mother had a new baby. His mother and Appellant moved out of the grandmother's house, leaving C.K. behind. C.K. began to have behavioral problems at that point. In December 1993, C.K. became unmanageable to the point his grandmother returned him to his mother's care.
On March 5, 1994, C.K. phoned his aunt. He was upset because he had gotten into a fight with his mother, who had locked him out of the house. His aunt picked him up and he slept at her house that night. The next day, C.K. told her that Appellant had been molesting him. She took C.K. to the Palm Beach County Sheriff's Office where they met with Detective Olesen and an HRS investigator. C.K. gave a tape-recorded statement to Detective Olesen. C.K.'s behavior worsened after this meeting. In fact, he was hospitalized two or three times in a mental institution. At that point, C.K. began psychological sessions with Dr. Sheila King.
At trial, the prosecution played the taped interview of C.K. and Detective Olesen. On the tape, C.K. describes how on a few occasions, after his mother would go to sleep, Appellant would come into his room and would perform oral sex upon him. C.K. also testified at trial, but did so via closed-circuit television after the trial judge made individualized findings that C.K. would suffer far more than moderate emotional harm if forced to testify in the physical presence of Appellant. C.K. testified that on a few occasions, Appellant would come into his room and perform oral sex upon him. His testimony was consistent with the taped interview that he had given to Detective Olesen.
The prosecution also called Dr. Sheila King to testify. Her testimony is the main subject of this appeal. She testified that she had twenty-one sessions with C.K. Originally, she began seeing C.K. for his behavioral problems. At one of the sessions, Dr. King had C.K. draw a picture. He drew himself with a penis on his head. Dr. King testified that children who are sexually abused often draw pictures with sexual references. C.K. would be verbal when they would discuss his mother, but when Dr. King would mention the abuse, he would become silent, he would cry, his posture would change, and he would stare at the ground. At subsequent sessions, C.K. would exhibit the same behavior when Dr. King would mention the abuse. At one session, C.K.'s demeanor was okay initially, but when he told her he thought that he had recently seen Appellant, C.K. became very agitated. He told her of how Appellant had come into his room after his mother was asleep and performed oral sex upon him. C.K. also told of how he had nightmares of Appellant and of the sexual abuse.
Dr. King testified about her opinions in this case, despite defense counsel's pretrial motion to exclude portions of her testimony and his timely objection at trial. She stated that she used the American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders (DSM-IV) which is widely accepted in the psychological community. In her opinion, pursuant to the criteria set forth in the DSM-IV, C.K. suffered from Post Traumatic Stress Disorder (PTSD). She further testified that C.K. exhibited symptoms consistent with a child who had been sexually abused. She stated that there were criteria she used to determine whether or not a child has been sexually abused. Dr. King testified that C.K. exhibited characteristics consistent with almost all of the criteria.
Appellant's first point of appeal is that the trial court erred by admitting Dr. King's testimony that C.K. exhibited *357 characteristics consistent with a child who has been sexually abused. We agree. Appellant correctly points out that this testimony is subject to the Frye[1] standard for admissibility. See Hadden v. State, 690 So.2d 573 (Fla.1997). It is true that an expert's opinion based on experience and training need not be Frye tested. See Flanagan v. State, 625 So.2d 827 (Fla. 1993). There is a distinction to be made, though, between pure opinion testimony and profile testimony. The portion of Dr. King's testimony that C.K. exhibited characteristics consistent with a child who has been sexually abused amounts to profile evidence. In Hadden, the supreme court held that "expert testimony offered to prove the alleged victim of sexual abuse exhibits symptoms consistent with one who has been sexually abused should not be admitted." Id. at 577. Such evidence has not been found to be generally accepted in the relevant scientific community. See id. Florida courts have consistently adhered to the Frye standard for admissibility to ensure that factual disputes are resolved using only sufficiently reliable scientific methods. See id. Profile evidence in child sexual abuse cases has not yet risen to the level of general acceptance and, thus, shall not be used as substantive evidence of guilt.
Here, the court did hold a pretrial hearing on the admissibility of this testimony and found that Post Traumatic Stress Disorder (PTSD) is a syndrome that has gained general acceptance in the field of psychology and psychiatry. We do not dispute this finding. The error lies in the fact that there was no finding made by the court that the use of PTSD, or the profile characteristics, to deduce whether a child has been sexually abused is generally accepted by the psychological community nor do we find any evidence presented below that could lead us to that conclusion. In fact, Dr. King testified at the pretrial motion hearing that she was not aware of any recognized "child abuse victim profile." She went on to testify that disagreement exists among psychologists on how to determine whether or not a child has been sexually abused. Thus, the problem lies not with the diagnosis that C.K. suffers from PTSD, but from Dr. King's use of PTSD and the profile characteristics to determine that C.K. was sexually abused.
Since we agree with Appellant that the admission of Dr. King's testimony regarding the profile evidence was erroneously admitted, we must now examine the record as a whole to determine whether or not the error was harmless. See Hadden, 690 So.2d at 581. We find that it was harmless and that the jury would have reached the same verdict if it were not presented with the profile evidence. Dr. King would still have testified that C.K. suffers from PTSD and that sexual abuse can bring about PTSD. She further could have testified, as she did, that there were no other factors in C.K.'s life that could have caused him to suffer from PTSD. There is evidence that C.K.'s behavioral problem increased dramatically after the abuse occurred, including suicide threats, throwing a knife at his aunt, and putting his hand through a glass window. The jury heard the allegations that C.K. made to Detective Olesen, to Dr. King, and to the jurors themselves. There is a great deal of consistency in all three instances, including the details of what occurred. We, therefore, hold that the admission of the profile testimony was harmless.
Appellant raises as the second assignment of error that the trial court denied his requests to interview the jurors and for a new trial. We agree with Appellant regarding the juror interviews and remand this case back to the trial court for proceedings consistent with this opinion.
Appellant filed a Motion for New Trial and for Interview of Jurors along with a supporting affidavit by Appellant's attorney. Appellant alleges that shortly after the verdict was rendered, two jurors came *358 to visit defense counsel with two allegations. The first allegation is that the bailiff told them that they were the third jury in the case. Defense counsel alleges that the jurors said that they discussed this matter during deliberations and suspected that there were two previous hung juries. The second allegation is that one of the jurors discussed the fact that the defendant did not testify on his own behalf. This same juror made a statement to the effect that an innocent man would have testified at trial. Appellant claims that these two allegations warrant a court order authorizing defense counsel to interview the jurors or a new trial.
Section 90.607(2)(b), Florida Statutes (1997), states that "[u]pon an inquiry into the validity of a verdict ..., a juror is not competent to testify as to any matter which essentially inheres in the verdict. ..." Jurors cannot be asked about their emotions, mental processes, or mistaken beliefs. See Baptist Hosp. of Miami, Inc. v. Maler, 579 So.2d 97, 99 (Fla.1991). A juror interview may only be ordered if the sworn allegations, if true, would require a new trial. See id. The inquiry must begin with whether or not these allegations essentially inhere in the verdict.
We will start with the allegation that a juror considered the fact that the defendant did not testify. It almost goes without saying that the jurors are not to consider the defendant's failure to testify as substantive evidence of guilt. We all share the right to be free from self-incrimination. In fact, jurors are instructed not to infer anything from the defendant's failure to testify. Yet, the failure to adhere to this instruction is an example of either misunderstanding the instruction or not following the court's instruction, both of which are considerations which essentially inhere in the verdict itself. See Sims v. State, 444 So.2d 922, 925 (Fla.1983), cert. denied, 467 U.S. 1246, 104 S.Ct. 3525, 82 L.Ed.2d 832 (1984). That being said, an interview of the jurors cannot be supported by information that they had concerns about the defendant not testifying.
We now turn to the allegation that a bailiff may have told the jurors that they comprised the third jury to sit on the case. The State concedes that this is a matter that does not inhere in the verdict. The State urges us to hold that the information passed from the bailiff to the jurors was trivial and that the prejudice was slight or nonexistent. This we cannot do.
The State argues that since Appellant's attorney did not allege prejudice in his affidavit, the affidavit is insufficient and, thus, an interview of the jurors cannot be ordered. We disagree with the State. All that is required in the affidavit are facts which allege an overt act that may have prejudiced the jury and these facts, if true, would require a new trial. See Baptist Hosp. of Miami, Inc., 579 So.2d at 100 n. 1. If Appellant can establish juror misconduct in the juror interviews, he is entitled to a rebuttable presumption of prejudice and, thus, a new trial. See State v. Hamilton, 574 So.2d 124 (Fla.1991). It is then incumbent upon the State to demonstrate to the court that any prejudice was harmless. The harmless error analysis "requires close scrutiny of the type of unauthorized material at issue, its relation to the issues at trial, and the extent to which jurors actually consulted the material." Id. at 127. We offer no opinion as to whether or not the prejudice is harmless.
We remand to the trial court with instructions to order the juror interviews. The inquiry shall be limited to objective demonstration of extrinsic factual matter disclosed to the jurors. See id. There shall be no inquiry into the thought processes of the jurors, only into the facts surrounding the information allegedly received from the bailiff.
It is so ordered.
*359 POLEN, TAYLOR, JJ., and FRUSCIANTE, JOHN A., Associate Judge, concur.
NOTES
[1] Frye v. United States, 293 F. 1013 (D.C.Cir. 1923).